**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MISSOURI**
**CENTRAL DIVISION**

| | |
|---|---|
| William Johnson and Joshua Kirk, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>Cornerstone National Insurance Company,<br><br>Defendant. | Civil Action No. 22cv4135<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs William Johnson and Joshua Kirk individually, and on behalf of all others similarly situated ("Plaintiffs"), upon personal knowledge of facts pertaining to them and on information and belief as to all other matters, by and through undersigned counsel, hereby bring this Class Action Complaint against Defendant Cornerstone National Insurance Company ("Cornerstone" or "Defendant"), and allege as follows:

## I. <u>INTRODUCTION</u>

1.     Every year millions of Americans have their most valuable personal information ("PI") stolen and sold online because of data breaches and unauthorized data disclosures. Despite warnings about the severe impact of unauthorized data disclosures on Americans of all economic strata, companies—including Defendant—still fail to put adequate security measures in place to prevent the unauthorized disclosure of private data belonging to their customers or potential customers.

2.     In the past two years, industry experts have specifically highlighted the importance of driver's license numbers and the ways in which a coordinated campaign by hackers and malicious attackers is dedicated to collecting those numbers in order to commit identity theft.  In fact, a driver's license is a critical part of a fraudulent, synthetic identity that can be sold on the dark web and is a jackpot for thieves that can be used to create fake driver's licenses or other fake IDs, open fraudulent accounts, avoid traffic tickets or collect government benefits such as unemployment checks, and use for verification on any government form that requires identity verification.  They are also exceptionally useful for fraudsters to craft curated phishing attacks and impersonate government officials to obtain even more information or insert malicious links or attachments into email.

3.     Drivers' license numbers have been taken from auto-insurance providers by hackers in multiple other attacks, including Geico, USAA, Farmers, Kemper, Metromile, and American Family all in 2021, and Elephant Insurance Company in 2022, indicating both that this particular form of PI is in high demand and also that sophisticated insurance companies like Defendant knew or had reason to know that its security practices were of particular importance to safeguard consumer data.  This is especially true given that the New York State Department of Financial Services issued an industry letter on February 16, 2021, stating that the department had recently learned of a systemic and aggressive campaign to exploit cybersecurity flaws in public-facing websites to steal the exact kind of

information stolen here, and to flag that such information was being used to submit fraudulent claims for pandemic and unemployment benefits."[1]

4.      Defendant provides automobile and homeowner's insurance to customers in multiple states throughout the country.  Defendant "value[s] you as a customer and we understand that your privacy is important."[2] And Defendant promises it does "not disclose any nonpublic personal information about our customers or former customers to anyone, except as permitted by law."[3]  Cornerstone further promises:

> **Confidentiality and Security of Personal Information**. We restrict access to nonpublic personal information to those employees, agents, representatives or parties who need to know the information in order to provide the products or services requested by our customers. In addition, we maintain physical, electronic and procedural safeguards to protect nonpublic personal information.[4]

5.      Yet, Defendant intentionally configured and designed their online agent insurance quoting platform to generate responses to requests for insurance quotes that included personal information from motor vehicle records that was obtained from third-party data providers.  If not for Defendant's intentional and knowing configuration and design of its systems, Plaintiffs' and Class Members' PI would not have been disclosed to cyber criminals.

---

[1] New York Department of Financial Services Industry Letter (Feb. 16, 2021), https://www.dfs.ny.gov/industry_guidance/industry_letters/il20210216_cyber_fraud_alert (last accessed July 5, 2022).

[2] *Cornerstone National Insurance Company Privacy Policy*, available at: https://f.hubspotusercontent10.net/hubfs/6858667/CNI%20Documents/CNI%20Privacy%20Policy%20(6-21)%20-%20Website%20and%20Portal.pdf (last visited Sept. 12, 2022).

[3] *Id.*

[4] *Id.*

6.     Defendant failed to meet its promises and its obligation to protect the sensitive personal information it collected, maintained, and used. Despite knowing that driver's license information is highly sensitive and legally restricted as a result of the Driver's Privacy Protection Act ("DPPA"), 18 U.S.C. § 2724, Defendant failed to secure this highly sensitive information collected from applications, customers, and its online life insurance registered agent platform, thereby making it public without consent and in violation of its own corporate promises and policy.

7.     As reported by Cornerstone to regulators starting August 4, 2022, between at least November 29, 2021 and July 6, 2022, Defendant believes that "an unauthorized third party gained access to certain agent user accounts and leveraged this access to run unauthorized searches in these subscription databases. including Plaintiffs' "name, and driver's license number."[5] In statements to regulators, Defendant estimated that at least 232,291 individuals were affected and notified,[6] including Plaintiffs. Cornerstone also states that it discovered the breach on November 29, 2021,[7] yet took 8 months to investigate and/or contain the breach, and took 9 months to notify regulators and provide actual notice to affected individuals. Defendant admitted there was unauthorized access to and disclosure of Plaintiffs' and Class Members' PI in the Notice Letter, as well as that

---

[5]   Office of the Maine Attorney General, Data Breach Notifications (Aug. 4, 2022), *available at*: https://apps.web.maine.gov/online/aeviewer/ME/40/0e2b3fa0-c37d-4645-afca-54ea90420a0e.shtml (last accessed Sept. 12, 2022).

[6]   *Id.*

[7]   *Id.*

Plaintiffs' and Class Members' PI was likely viewed and accessed from, and taken off of, Defendant's computer networks.[8]

8.    Defendant is legally required to protect the personal information ("PI") it gathers from unauthorized access and exfiltration. PI is defined as including a person's social security number, driver's license number, name, address, telephone number, and medical or disability information.[9] Defendant acknowledges this in its privacy policy when it characterizes the information it collects, including driver's license numbers, as "nonpublic personal information."[10]

9.    As a result of Defendant's failure to provide reasonable and adequate data security, Defendant violated state and federal law by improperly disclosing Plaintiffs' and the Class Members' PI—including their especially sensitive driver's license numbers and the names used to identify them— to unauthorized parties and/or entities. As a direct result of Defendant's acts and/or omissions, the unauthorized parties are already attempting to use the improperly disclosed information to commit identity theft and fraudulently open financial accounts in Plaintiffs' names. Plaintiff Joshua Kirk has already had two incidents of fraud that happened after the breach but before Cornerstone notified him.  All Plaintiffs and Class Members are now at much higher risk of continued identity theft and for cybercrimes of all kinds, especially considering the highly valuable and sought-after

---

[8]  *See supra* note 14.
[9]  18 U.S.C. § 2725(3).
[10]  *See supra* note 2.

private PI stolen here, and have suffered damages related to lost time, loss of privacy, and other harms.

## II. PARTIES

10.    Plaintiff William Johnson is a resident of Newport Beach, California. On or about August 4, 2022, Plaintiff Johnson received notice via U.S. mail from Defendant that it improperly exposed his PI to unauthorized third parties.

11.    Plaintiff Joshua Kirk is a resident of Kingsport, Tennessee.  On or about August 4, 2022, Plaintiff Kirk received notice via U.S. mail from Defendant that it improperly exposed his PI to unauthorized third parties.

12.    Defendant Cornerstone National Insurance Company is a Missouri domestic corporation with a principal place of business at 19 S. Sixth St., Columbia, Missouri, 65201.  Cornerstone is licensed to do business and markets, sells, and underwrites automobile insurance policies in Arkansas, Illinois, Indiana, Kansas, Missouri, Oklahoma, and Tennessee.

## III. JURISDICTION AND VENUE

13.    Subject matter jurisdiction in this civil action is authorized pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d) because there are more than 100 Class Members, at least one class member is a citizen of a state different from that of Defendant, and the amount in controversy exceeds $5 million, exclusive of interest and costs. The Court also has federal question jurisdiction under 28 U.S.C. § 1331 for the Drivers' Privacy Protection Act claims and supplemental jurisdiction over the state law

claims pursuant to 28 U.S.C. § 1367 because all claims alleged herein form part of the same case or controversy.

14. This Court has personal jurisdiction over Defendant because it maintains its principal place of business in this District, is authorized to and regularly conducts business in this District and in Missouri, and has sufficient minimum contacts with the State of Missouri. Defendant makes decisions regarding the corporate governance and management of its insurance business, including decisions regarding the security measures to protect its customers' PI, in this District. Defendant also intentionally avails itself of this jurisdiction by promoting, selling, and marketing services from Missouri to millions of consumers nationwide.

15. Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) through (d) because Defendant resides in this District and, on information and belief, a substantial part of the events or omissions giving rise to Plaintiffs' and Class Members' claims emanated from this District, including, without limitation, decisions made by Defendant's governance and management personnel or inaction by those individuals that led to misrepresentations, invasions of privacy, and the Unauthorized Data Disclosure.

16. Venue is proper in the Central Division pursuant to Local Rule 3.2(b)(1) because Defendant resides in Boone County, Missouri.

# IV. FACTUAL ALLEGATIONS

## A. Defendant Collected PI but Failed to Adhere to Non-Disclosure Requirements and Promises.

17. Cornerstone "strive[s] to be your insurance support system for life." In doing so, Cornerstone "promise[s] to empower you along your unique insurance journey by arming your home and auto policy with the tools it needs to keep what matters most safe at every turn. When you have the right insurance team in your corner, you can stop stressing about the unexpected and start living a little more."[11] Cornerstone sells automobile and homeowners insurance policies through independent agents in Oklahoma, Illinois, Tennessee, Arkansas, Kansas, and Missouri, "a vast network of experienced independent agents who live and work in your community. They value your time and leave no questions unanswered. Their goal is to pave a clearer path to your insurance satisfaction by offering the one luxury you deserve: options."[12]

18. Like other insurance providers, Cornerstone collects various kinds of PI through multiple processes: applications through an online platform used by insurance agents, other application processes and forms, consumer report information, transaction information, and website information.[13] Defendant specifically acknowledge and designate this information as "nonpublic personal information." The "nonpublic personal information" collected and stored by Defendant is substantially wider in scope than what Cornerstone reports was accessed and exfiltrated from its network and includes: name,

---

[11] https://www.cornerstonenational.com/about (last accessed Sept. 12, 2022).
[12] https://www.cornerstonenational.com/ (last accessed Sept. 12, 2022).
[13] *See supra* note 2.

address, driver license number, date of birth, social security number, transaction information, insurance coverage selections, premiums, payment history, claims investigation and adjusting information, consumer reporting information, driving record and claims and credit history.[14]

19.     In November 2021, Defendant "became aware that an unauthorized third party gained access to certain agent user accounts and leveraged this access to run unauthorized searches in these subscription databases."[15]  Following that, "Cornerstone immediately issued a global password reset and notified its software vendor, who conducted a forensic investigation to confirm security. Once the environment was secure, we moved forward with a comprehensive analysis into the extent of unauthorized activity."[16]  After an investigation which concluded July 6, 202, Cornerstone determined that information including names and driver's license numbers may have been "accessed by an unauthorized third party."[17]  Defendant has not provided additional details on the mechanism through which the incident occurred, how Defendant limited the information accessed and exfiltrated to only a subset of the PI it collects, or how Defendant determined which individuals to notify.  This incident is referred to herein as the "Unauthorized Data Disclosure."

---

[14] *Id.*

[15] Notice of Data Breach, filed with the Montana Attorney General, https://media.dojmt.gov/wp-content/uploads/Consumer-Notification-Letter-479.pdf (last accessed Sept. 12, 2022).

[16] *Id.*

[17] *Id.*

20.     Plaintiffs, along with members of the Class, received a letter from Cornerstone titled "Notice of Data Security Incident," dated August 4, 2022. The letter stated that their PI, detailed below, may have been compromised, and included the following:

<u>What Happened and What Information was Involved:</u>

Cornerstone National Insurance Company ("Cornerstone") is an insurance company located in Missouri. Through its policy management software, Cornerstone and its external agents access various subscription services, including computerized databases where driver's license information is available for the purpose of performing insurance application due diligence.

On November 29, 2021, Cornerstone became aware that an unauthorized third party gained access to certain agent user accounts and leveraged this access to run unauthorized searches in these subscription databases. Cornerstone immediately issued a global password reset and notified its software vendor, who conducted a forensic investigation to confirm security. Once the environment was secure, we moved forward with a comprehensive analysis into the extent of unauthorized activity.

These investigations, which concluded on July 6, 2022, determined that the following personal information could have been accessed by an unauthorized third party: first name, last name, and driver's license number.

We have not received information of a specific misuse of any personal information.

<u>What We Are Doing:</u>

Data security is a priority to Cornerstone. Upon detecting this incident we moved quickly to initiate a response, which included the above-referenced communications and investigation, as well as confirming the security of our network environment. We are also reviewing and enhancing our technical safeguards.

Additionally, we are offering you free credit monitoring and identity theft protection services through IDX, a leading identity protection technology company. IDX services include: <12/24> of credit monitoring and fully

managed identity theft recovery services. With this protection, IDX will help you resolve issues if your identity is compromised.

<u>What You Can Do:</u>

To enroll in Credit Monitoring services at no charge, please log on to https://response.idx.us/cornerstone and follow the instructions provided. When prompted please provide the following enrollment code to receive services: [Enrollment Code]. IDX is available Monday through Friday, 9:00 am – 9:00 pm EST. Please note the deadline to enroll is **November 4, 2022**.

We encourage you to take full advantage of this service offering. IDX representatives have been fully versed on the incident and can answer questions or concerns you may have regarding protection of your personal information.

Enclosed you will find additional information regarding the resources available to you, and the steps that you can take to further protect your personal information.

<u>For More Information</u>:

We recognize that you may have questions not addressed in this letter. If you have additional questions, please call IDX at (833) 423-2977, Monday through Friday, 9:00 am – 9:00 pm EST.

We value the security of the personal data that we maintain, and understand the frustration, concern, and inconvenience that this incident may have caused.

Sincerely,

Cornerstone National Insurance Company[18]

21. The Notice confirms Plaintiffs were victims of the Unauthorized Data Disclosure because Defendant collected their information "through its [use of] policy management software," where "Cornerstone and its external agents access various subscription services, including computerized databases where driver's license information

---

[18] *See supra* note 15.

is available." The Notice also confirms that driver's license numbers were acquired when an unauthorized third party "gained access to certain agent user accounts and leveraged this access to run unauthorized searches," meaning that those numbers were viewed and then accessed by third parties on Defendant's servers.

22.     After receiving Unauthorized Data Disclosure notice letters, it is reasonable for Plaintiffs and Class Members in this case to believe that the risk of future harm (including identity theft) is substantial and imminent, and to take steps to mitigate that substantial risk of future harm. In fact, Defendant's letter specifically instructs Plaintiffs and the Class: "You should always remain vigilant and monitor your accounts for suspicious or unusual activity."[19]   Defendant also acknowledges that the Unauthorized Data Disclosure is a source of "frustration, concern, and inconvenience" for Plaintiffs and Class Members. This is because the drivers' license numbers are taken for the purpose of committing fraud in the name of the person whose license information is taken.   And because driver's licenses contain, or can be used to gain access to, uniquely qualifying and comprehensive identifying information such as eye color, height, weight, sex, home address, medical or visual restrictions, and living will/health care directives, most insurance and credit agencies highly recommend that immediate notice, replacement, and identity theft protections are put in place for a minimum of 3 years.

---

[19] *Id.*

12

**B.**    <u>The PI Disclosed by Defendant as a Result of its Disregard for Data Security is Highly Valuable on the Black Market.</u>

23.    The information Defendant failed to protect in violation of state and federal law is very valuable to phishers, hackers, identity thieves, and cyber criminals, especially at this time where unprecedented numbers of criminals are filing fraudulent unemployment benefit claims and driver's license information is uniquely connected financial fraud, as well as to the ability to file a fraudulent unemployment benefit claim.

24.    Indeed, these hackers often aggregate information taken from data breaches on users to build profiles on individuals. These profiles combine publicly available information with information discovered in previous data breaches and exploited vulnerabilities. There are few data breaches that provide a comprehensive snapshot of any one individual person. Unique and persistent identifiers such as Social Security Numbers, driver's license numbers, usernames, and financial account numbers (e.g., credit cards, insurance policy numbers, etc.) are critical to easily forging an identity. When not all information is available, the information that is stolen is used to socially engineer a victim into providing additional information so a "fullz"[20] profile can be obtained.

25.    For example, a health care system and a retail store point-of-sale system may have two unrelated data breaches where an individual's information is taken. The individual's driver's license may not be in either of those data bases, but after the Unauthorized Data Disclosure, a threat actor could have improved the profile and added a

---

[20] "Fullz" is slang used by threat actors and various criminals meaning "full information," a complete identity profile or set of information on any entity or individual.

driver's license number. The value of that profile would allow such crimes as identity theft, financial crimes, and even illegal voting that would not previously have been possible.

26.     There is no legitimate or legal reason for anyone to use Defendant's inadequate website security to acquire driver's license information of Plaintiffs and the Class. The only reason is for immediate or eventual malicious intent, since no one would go to the trouble of obtaining data that had no value. Any non-public data, especially government issued identification numbers like a driver's license or non-driver's identification number, has criminal value. On the darknet markets, a driver's license, combined with the full name and state issued, is a sought-after data point. Darknet markets are a downstream "flea market" for data to be sold, usually not by the original threat actor or criminal group. It is a dumping ground, usually after the data has been exploited.

27.     The value of stolen driver's license information currently has a darknet market (DNM) value of $1 per license. This was re-verified on March 3, 2022, accessing several DNMs using a trusted identity. Social Security Numbers, once considered the "gold standard" of identity fraud, are also selling for $1 per value in those same markets. This illustrates the value of driver's license information to cybercriminals and people committing identity fraud. According to popular darknet markets, cyber criminals value driver's licenses equally to Social Security Numbers.

28.     In some ways, driver's license numbers are even more attractive than Social Security Numbers to threat actors and more dangerous to the consumer when compromised. Unlike a Social Security Number, a driver's license number is not monitored as closely, so it can potentially be used in ways that will not immediately alert the victim.

Threat actors know this as well. Because driver's licenses contain, or can be used to gain access to, uniquely qualifying and comprehensive identifying information such as eye color, height, weight, sex, home address, medical or visual restrictions, and living will/health care directives, most insurance and credit agencies highly recommend that immediate notice, replacement, and identity theft protections are put in place for a minimum of 3 years. Most cyber experts, including Enterprise Knowledge Partners, recommend five years or more.

29. Stolen driver's licenses can be used (alone or in combination with other information) by malicious actors to accomplish the following:

- Apply for credit cards

- Apply for financial loans (especially student loans)

- Open bank accounts

- Rent a car in the victim's name

- Obtain or create fake driver's licenses

- Given to police for tickets

- Provided to accident victims

- Collect government unemployment benefits

- Create and sell underage fake IDs

- Replace/access account information on:

  - LinkedIn

  - Facebook/Meta

- o WhatsApp

- o Instagram

- Obtain a mobile phone

- Dispute or prove a SIM swap

- Redirect U.S. mail

- Apply for unemployment benefits

- Undocumented individuals may use them as a method to gain access to the U.S., and claim a lost or stolen passport

- Create a fake license as a baseline to obtain a Commercial Driver's License

- File tax returns or gain access to filed tax returns

- Engage in phishing and other social engineering scams

30. Unsecured sites that contain or transmit PI, such as a driver's license, require notice to consumers when the data is stolen because it can be used to perform identity theft and other types of fraud. A threat actor is usually motivated by financial or political gain before it exerts time, and skill to compromise and exfiltrate. Over time, identity thieves have systematized their criminal activities to gather important pieces of a synthetic identity from multiple breaches and sources. The theft of a driver's license number is no less valuable in that endeavor than the theft of a Social Security Number, as demonstrated by these two unique identifiers carrying the same price on the darknet, and by the fact that the identity thieves have demonstrated a systematic and businesslike process for collecting

these stolen driver's license numbers in this Unauthorized Data Disclosure and others committed against insurers.

31.     The frequency of cyberattacks has increased significantly in recent years.[21] In fact, "Cyberattacks rank as the fastest growing crime in the US, causing catastrophic business disruption. Globally, cybercrime damages are expected to reach US $6 trillion by 2021."[22]

32.     Cybersecurity Ventures, a leading researcher on cybersecurity issues,

> expects global cybercrime costs to grow by 15 percent per year over the next five years, reaching $10.5 trillion USD annually by 2025, up from $3 trillion USD in 2015. This represents the greatest transfer of economic wealth in history, risks the incentives for innovation and investment, is exponentially larger than the damage inflicted from natural disasters in a year, and will be more profitable than the global trade of all major illegal drugs combined.[23]

33.     As noted in recent reports by Deloitte and Interpol, cyberattacks have greatly increased in the wake of the COVID-19 pandemic.[24]

---

[21] *See The Cost of Cybercrime,* Accenture Security, available at: https://www.accenture.com/_acnmedia/PDF-96/Accenture-2019-Cost-of-Cybercrime-Study-Final.pdf (last accessed Feb. 15, 2022).

[22] *Top Cyberattacks of 2020 and How to Build Cyberresiliency*, ISAC, available at: https://www.isaca.org/resources/news-and-trends/industry-news/2020/top-cyberattacks-of-2020-and-how-to-build-cyberresiliency (last accessed Feb. 15, 2022) (citing Cybersecurity Ventures, https://cybersecurityventures.com/hackerpocalypse-cybercrime-report-2016).

[23] Steve Morgan, *Cybercrime To Cost The World $10.5 Trillion Annually By 2020*, Cybercrime Magazine, Nov. 13, 2020, https://cybersecurityventures.com/hackerpocalypse-cybercrime-report-2016 (last accessed Feb. 15, 2022).

[24] Deloitte, *Impact of COVID-19 on Cybersecurity*, https://www2.deloitte.com/ch/en/pages/risk/articles/impact-covid-cybersecurity.html (last accessed Feb. 15, 2022); Interpol, *Cyberthreats are constantly evolving in order*

34. As alleged above, stolen PI is often trafficked on the "dark web," a heavily encrypted part of the Internet that is not accessible via traditional search engines. Law enforcement has difficulty policing the dark web due to this encryption, which allows users and criminals to conceal identities and online activity.

35. When malicious actors infiltrate companies and exfiltrate the PI that those companies store or have access to, that stolen information often ends up on the dark web because the malicious actors buy and sell that information for profit.[25] "Why else would hackers . . . steal consumers' private information? Presumably, the purpose of the hack is, sooner or later, to make fraudulent charges or assume those consumers' identities." *Remijas v. Neiman Marcus Grp., LLC*, 794 F.3d 688, 693 (7th Cir. 2015).

36. Consumers' PI remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[26] Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the dark web.[27] Alternatively,

_____

*to take advantage of online behaviour and trends. The COVID-19 outbreak is no exception*, https://www.interpol.int/en/Crimes/Cybercrime/COVID-19-cyberthreats (last accessed Feb. 15, 2022).

[25] *Shining a Light on the Dark Web with Identity Monitoring*, IdentityForce, Dec. 28, 2020, *available at*: https://www.identityforce.com/blog/shining-light-dark-web-identity-monitoring (last visited Feb. 15, 2022).

[26] Anita George, *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at*: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last visited Feb. 15, 2022).

[27] Brian Stack, *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, *available at*: https://www.experian.com/blogs/ask-

criminals are able to purchase access to entire company data breaches for $900 to $4,500.[28] (Note: the prices can vary depending on the point in the chain – verified identities may sell for higher prices early in the chain, then for the lower prices described above when they reach the "flea market sites.")

37. The information compromised in the Unauthorized Data Disclosure is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. And the information compromised in the Unauthorized Data Disclosure can be used to *open* fraudulent bank accounts and credit and debit cards, as well as benefits accounts in various state benefits offices, compounding the identity theft and cycle of black market sales detailed above. The driver's license numbers compromised in this Unauthorized Data Disclosure are also more valuable because driver's license numbers are long lasting, and difficult and problematic to change.

38. Recently, Forbes writer Lee Mathews reported on Geico's unauthorized data disclosure that included driver's license numbers:

> Hackers harvest license numbers because they're a very valuable piece of information. A driver's license can be a critical part of a fraudulent, synthetic identity – which go for

---

experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last visited Feb. 15, 2022).

[28] *In the Dark*, VPNOverview, 2019, *available at*: https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last accessed Feb. 15, 2022).

about $1200 on the Dark Web. On its own, a forged license can sell for around $200.[29]

39. National credit reporting company, Experian, blogger Gayle Sato also emphasized the value of driver's license information to thieves and cautioned:

> Your driver's license may not seem like a jackpot for thieves, but it can be used to create fake driver's licenses, open accounts in your name, avoid traffic tickets or collect government benefits such as unemployment checks. Worse, if your license data has been stolen in a data breach, you may not even know it's being misused.[30]

40. In fact, according to CPO Magazine, which specializes in news, insights and resources for data protection, privacy and cyber security professionals,

> To those unfamiliar with the world of fraud, driver's license numbers might seem like a relatively harmless piece of information to lose if it happens in isolation. Tim Sadler, CEO of email security firm Tessian, points out why this is not the case and why these numbers are very much sought after by cyber criminals: " . . . It's a gold mine for hackers. With a driver's license number, bad actors can manufacture fake IDs, slotting in the number for any form that requires ID verification, or use the information to craft curated social engineering phishing attacks. . . . bad actors may be using these driver's license numbers to fraudulently apply for unemployment benefits in someone else's name, a scam proving especially lucrative for hackers as unemployment numbers continue to soar. . . . In other cases, a scam using these driver's license numbers could look like an email that impersonates the DMV, requesting the person verify their

---

[29] Lee Mathews, *Hackers Stole Customers' License Numbers from Geico in Months-Long Breach*, (April 20, 2021), *available at*: https://www.forbes.com/sites/leemathews/2021/04/20/hackers-stole-customers-license-numbers-from-geico-in-months-long-breach/?sh=3066c2218658 (last visited Feb. 15, 2022).

[30] Gayle Sato*, What Should I Do If My Driver's License Number Is Stolen?* (Nov. 3, 2021), *available at*: https://www.experian.com/blogs/ask-experian/what-should-i-do-if-my-drivers-license-number-is-stolen/ (last visited Feb. 15, 2022).

driver's license number, car registration or insurance information, and then inserting a malicious link or attachment into the email.[31]

41.    Drivers' license numbers have been taken from auto-insurance providers by hackers in other circumstances, including Geico, Farmers, USAA, Elephant and American Family all in the last two years, indicating both that this particular form of PI is in high demand[32] and also that Defendant knew or had reason to know that its security practices were of particular importance to safeguard consumer data.[33]

42.    In fact, when Geico announced that its online quoting platform was subject to a breach, its data breach notice filed with the California Attorney General explicitly stated that GEICO had "reason to believe that this information could be used to fraudulently apply for unemployment benefits in your name."[34]

---

[31] Scott Ikeda, *Geico Data Breach Leaks Driver's License Numbers, Advises Customers to Watch Out for Fraudulent Unemployment Claims*, (April 23, 2021), available at: https://www.cpomagazine.com/cyber-security/geico-data-breach-leaks-drivers-license-numbers-advises-customers-to-watch-out-for-fraudulent-unemployment-claims/ (last accessed Feb. 14, 2022).

[32] *Id.*

[33] *See* United States Securities and Exchange Commission Form 8-K for INSU Acquisition Corp. II (Feb. 1, 2021), available at: https://www.sec.gov/Archives/edgar/data/1819035/000121390021005784/ea134248-8k_insuacquis2.htm?=1819035-01022021 (last accessed Feb. 15, 2022) (announcing a merger with auto-insurance company MetroMile, Inc., an auto-insurer, which announced a drivers' license number Data Disclosure on January 19, 2021); Ron Lieber, *How Identity Thieves Took My Wife for a Ride*, N.Y. TIMES (Apr. 27, 2021), available at: https://www.nytimes.com/2021/04/27/your-money/identity-theft-auto-insurance.html (last accessed Feb. 15, 2022) (describing a scam involving drivers' license numbers and Progressive Insurance).

[34] *See https://www.documentcloud.org/documents/20618953-geico-data-breach-notice* (GEICO notice filed with Cailfornia Attorney General dated April 9, 2021)

43.     Further, an article on TechCrunch explains that it is driver's license or non-driver's identification numbers themselves that are the critical missing link for a fraudulent unemployment benefits application: "Many financially driven criminals target government agencies using stolen identities or data. But many U.S. states require a government ID — like a driver's license — to file for unemployment benefits. To get a driver's license number, fraudsters take public or previously breached data and exploit weaknesses in auto insurance websites to obtain a customer's driver's license number. That allows the fraudsters to obtain unemployment benefits in another person's name."[35]

44.     In addition, the New York State Department of Financial Services issued an industry letter on February 16, 2021, stating that they had "recently learned of a systemic and aggressive campaign to exploit cybersecurity flaws in public-facing websites to steal [nonpublic information, including] websites that provide an instant quote. . . .  [I]t received reports from two auto insurers in late December 2020 and early January 2021, that cybercriminals were targeting their websites that offer instant [] quotes [] to steal unredacted driver's license numbers. . . . . DFS has confirmed that, at least in some cases, this stolen information has been used to submit fraudulent claims for pandemic and unemployment benefits . . . DFS [] has also discovered communications on cybercrime

---

[35]  Zach Whittaker, *Geico Admits Fraudsters Stole Customers' Driver's License Numbers for Months*, TechCrunch (Apr. 19, 2021), https://techcrunch.com/2021/04/19/geico-driver-license-numbers-scraped/#:~:text=To%20get%20a%20driver's%20license,benefits%20in%20another%20person's%20name (last accessed Mar. 2, 2022).

forms offering to sell techniques to access driver's license numbers from auto insurance websites and step-by-step instructions on how to steal them."[36]

45. Once PI is sold, it is often used to gain access to various areas of the victim's digital life, including bank accounts, social media, credit card, and tax details, or to fraudulently manufacture new accounts for access and sale. This can lead to additional PI being harvested from the victim, as well as PI from family, friends and colleagues of the original victim.

46. Victims of drivers' license number theft also often suffer unemployment benefit fraud, harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts. Unauthorized data disclosures facilitate identity theft as hackers obtain consumers' PI and thereafter use it to siphon money from current accounts, open new accounts in the names of their victims, or sell consumers' PI to others who do the same.

47. For example, the United States Government Accountability Office noted in a June 2007 report on data breaches (the "GAO Report") that criminals use PI to open financial accounts, receive government benefits, and make purchases and secure credit in a victim's name.[37] The GAO Report further notes that this type of identity fraud is the most harmful because it may take some time for a victim to become aware of the fraud, and can

---

[36] *See supra* note 1.

[37] *See* Government Accountability Office, *Personal Information: Data Breaches are Frequent, but Evidence of Resulting Identity Theft is Limited; However, the Full Extent is Unknown* (June 2007), available at http://www.gao.gov/assets/270/262899.pdf (last visited May 29, 2021).

adversely impact the victim's credit rating in the meantime. The GAO Report also states that identity theft victims will face "substantial costs and inconveniences repairing damage to their credit records . . . [and their] good name."[38]

## C. Defendant Was on Notice of the Sensitive and Private Nature of the PI It Stored and Utilized for Insurance Quotes, and Its Duty to Safeguard the PI.

48. At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding PI and of the foreseeable consequences if its data security systems were breached, including the significant costs that would be imposed on Plaintiffs and the Class as a result of a breach.

49. Defendant knowingly refrained from implementing basic security measures to protect Plaintiffs' and Class Members' PI, including information obtained from motor vehicle records, in spite of having control over the configuration and design of their online quoting platform.

50. In fact, NYSDFS, in their February 16, 2021, industry letter recommended the following steps for entities that maintain public-facing websites:

   a.   Conduct a thorough review of website security controls, including but not limited to a review of its Secure Sockets Layer (SSL), Transport Layer Security (TLS), and HTTP Strict Transport Security (HSTS and Hypertext Markup Language (HTML) configurations.

   b.   Review websites for browser web developer tool functionality. Verify and, if possible, limit the access that users may have to adjust, deface, or manipulate website content using web developer tools on the public-facing websites.

---

[38] *Id.*

c.    Review and confirm that its redaction and data obfuscation solution for NPI is implemented properly throughout the entire transmission of the NPI until it reaches any website.

d.    Ensure that privacy protections are up to date and effectively protect NPI by reviewing who is authorized to see NPI, which applications use NPI, and where NPI resides.

e.    Search and scrub public code repositories for proprietary code.

f.    Block the IP addresses of the suspected unauthorized users and consider a quote limit per user session.[39]

51.    NYSDFS also recommended that "[t]o combat this cybercrime, the following basic security steps should be implemented…

a.    Install Web Application Firewall (WAF). WAFs help protect websites from malicious attacks and exploitation of vulnerabilities by inspecting incoming traffic for suspicious activity.

b.    Implement CAPTCHA. Cybercriminals use automated programs or "bots" to steal data. Completely Automated Public Turing Tests ("CAPTCHA") attempt to detect and block bots.

c.    Improve Access Controls for Agent Portals. Agent portals typically allow agents access to consumer NPI, and robust access controls are required by DFS's cybersecurity regulation.

d.    Training and awareness. Employees and agents should be trained to identify social engineering attacks. Employees and agents should know not to disclose NPI, including DLNs, over the phone. Robotic scripts with grammatical errors or repeated statements used during dialogue are key identifiers of fraudulent calls.

---

[39] Industry Letter, *supra*, note 1. Note that this Industry Letter was reported online on numerous websites, including: https://digitalguardian.com/blog/public-facing-financial-services-sites-ripe-data-theft (Feb. 23, 2021); https://www.gravoc.com/2021/04/09/cyber-fraud-alert-issued-for-websites-collecting-npi/ (Apr. 9, 2021); and https://www.dfs.ny.gov/industry_guidance/industry_letters/il20210216_cyber_fraud_al ert (Feb. 16, 2021).

e.     Limit access to NPI. Employees and agents should only have access to sensitive information that is necessary to do their job.

f.     Wait until payments have cleared before issuing a policy. Auto insurers should consider waiting until an eCheck, credit card, or debit card payment has been cleared by the issuing bank before generating an online policy and granting the policyholder access to NPI.

g.     Protect NPI received from data vendors. Ensure that APIs used to pull data files, including JSON and XML, from data vendors are not directly accessible for the internet or agent portals.[40]

52.     "Insurance companies are desirable targets for cyber attackers because they work with sensitive data."[41] In fact, according to the Verizon 2020 Data Breach Investigations Report, there were 448 confirmed data breaches in the financial and insurance industries.[42]

53.     In 2021, drivers' license numbers were taken from auto-insurance providers by hackers in multiple attacks on similar companies, including Geico, Farmers, USAA, Kemper, Metromile, and American Family. This proves this particular form of personal information is in high demand by hackers and also that sophisticated insurance companies like Defendants knew or were on notice that their security practices were of particular importance to safeguard consumer data.

---

[40] Industry Letter, New York Department of Financial Services Industry Letter (March 30, 2021), https://www.dfs.ny.gov/industry_guidance/industry_letters/il20210330_cyber_alert_followup, (last accessed August 30, 2022).

[41] Data Protection Compliance for the Insurance Industry (October 7, 2020), *available at*: https://www.ekransystem.com/en/blog/data-protection-compliance-insurance-industry (last visited Feb. 15, 2022).

[42] 2020 Data Breach Investigations Report, Verizon, *available at*: https://enterprise.verizon.com/content/verizonenterprise/us/en/index/resources/reports/2020-data-breach-investigations-report.pdf (last visited Feb. 15, 2022).

54.    Defendant claims "we value the security of the personal data that we maintain."[43] Defendant "value[s] you as a customer and we understand that your privacy is important."[44] And Defendant promises it does "not disclose any nonpublic personal information about our customers or former customers to anyone, except as permitted by law."[45]  Cornerstone further promises:

> **Confidentiality and Security of Personal Information**. We restrict access to nonpublic personal information to those employees, agents, representatives or parties who need to know the information in order to provide the products or services requested by our customers. In addition, we maintain physical, electronic and procedural safeguards to protect nonpublic personal information.[46]

55.    In addition, Cornerstone is an insurance company that sells auto insurance and uses motor vehicle records to verify identities and underwrite policies. Its underwriting and other insurance activities are explicitly subject to the DPPA, which was enacted in 1994 and has been in effect for almost three decades.

56.    Furthermore, Defendant consciously uses PI, including driver's license numbers and other motor vehicle records stored on or accessed by their systems that they intentionally disclose to facilitate generating insurance quotes. Defendant's continual collection of PI in the form of customer information, driving records, accident reports, and other motor vehicle information, along with its insurance underwriting and business collection of driver's license and other motor vehicle information and subscription to motor

---

[43] *See supra* note 14.
[44] *See* supra note 2.
[45] *Id.*
[46] *Id.*

vehicle records services that use the same, put Cornerstone in the position of knowing that it was obligated to protect the privacy of customers and potential customers like Plaintiffs and Class Members.

57.     As a result, Defendant's safety and security promises were facially insufficient. Despite the clear danger that insecure use of PI poses, Defendant knowingly chose to configure and design their agent portal system in a manner which allowed access to and disclosure of Plaintiffs' and Class Members' driver's license numbers, which are motor vehicle records, in violation of Defendant's company policy and applicable law.

**D.     Defendant Failed to Comply with Federal Trade Commission Requirements.**

58.     Federal and state governments established security standards and issued recommendations to minimize unauthorized data disclosures, and the resulting harm to individuals and financial institutions. The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses highlighting the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[47]

59.     In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established guidelines for fundamental data security principles and practices for business.[48] Among other things, the guidelines note businesses should

_____

[47] Federal Trade Commission, *Start With Security: A Guide for Business*, available at: https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last accessed Feb. 15, 2022).

[48] *See* Federal Trade Commission, *Protecting Personal Information: A Guide for Business* (Oct. 2016), available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited Feb. 15, 2022).

properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct security problems. The guidelines also recommend businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[49]

60.     The FTC recommends that companies not maintain PI longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[50]

61.     Highlighting the importance of protecting against unauthorized data disclosures, the FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect PI, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act

---

[49] *Id.*
[50] *See supra* note 41.

("FTC Act"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.[51]

62.     Failing to take basic security measures in designing and implementing its computer systems and securing Plaintiffs' and Class Members' PI, Defendant allowed thieves—to access and collect individuals' PI. Defendant failed to employ reasonable and appropriate measures to protect against unauthorized disclosure and access to Plaintiffs' and Class Members' PI. Defendant's data security policies and practices constitute unfair acts or practices prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

63.     The FTC has interpreted Section 5 of the FTC Act to encompass failures to appropriately store and maintain personal data. The body of law created by the FTC recognizes that failure to restrict access to information[52] and failure to segregate access to information[53] may violate the FTC Act.

64.     Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data, including driver's license numbers and other motor vehicle records (i.e., PI) constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

---

[51] *See* Federal Trade Commission, *Privacy and Security Enforcement Press Releases*, available at https://www.ftc.gov/news-events/media-resources/protecting-consumer-privacy/privacy-security-enforcement (last visited Feb. 15, 2022).

[52] *In the Matter of LabMD, Inc.*, Dkt. No. 9357, Slip Opinion, at 15 ("Procedures should be in place that restrict users' access to only that information for which they have a legitimate need."), *available at* https://www.ftc.gov/system/files/documents/cases/160729labmd-opinion.pdf.

[53] *F.T.C. v. Wyndham Worldwide Corp.*, 799 F.3d 236, 258 (3d Cir. 2015) (companies should use "readily available security measures to limit access between" data storage systems).

E.     **Defendant Contravenes the Purpose of the Driver's Privacy Protection Act**

65.     Prior to the enactment of the Driver's Privacy Protection Act, Congress found that most states freely turned over DMV information to whomever requested it with only few restrictions. 137 Cong. Rec. 27,327 (1993).

66.     Due to these lack of restrictions, Congress grew concerned that potential criminals could easily access home addresses and telephone numbers of potential victims. 140 Cong. Rec. 7929 (1994) (statement of Rep. Porter Goss).

67.     These concerns did, in fact, materialize in the occurrence of crime, harassment, and stalking. Most notably, in 1989, a stalker shot and killed Rebecca Schaeffer, an upcoming actor, after obtaining her unlisted home address from the California DMV. 137 Cong. Rec. 27,327 (1993). In advocating for the DPPA, Representative Jim Moran (D-VA) recounted thieves using information from the DMV to learn home addresses and commit burglary and theft. 137 Cong. Rec. 27,327 (1993). Similarly, Senator Barbara Boxer (D-CA) explained how a man used the DMV to obtain the home addresses of several young women and sent them harassing letters. 39 Cong. Rec. 29,466 (1993). In another instance, a woman who visited a clinic that performed abortions found black balloons outside her home after a group of anti-abortion activists sought to harass her upon seeing her car in the clinic's parking lot. 139 Cong. Rec. 29,462 (1993) (statement of Sen. Chuck Robb).

68.     In light of public outrage over the Schaeffer murder and growing concern for the threat to public safety that free access to DMV records posed, Congress enacted the DPPA "to protect the personal privacy and safety of licensed drivers consistent with the

legitimate needs of business and government." S. Res. 1589, 103rd Cong. §1(b), 139 Cong. Rec. 26,266 (1993) (enacted).

69.     Additionally, in enacting the DPPA, Congress was motivated by its "[c]oncern[] that personal information collected by States in the licensing of motor vehicle drivers was being released – even sold – with resulting loss of privacy for many persons." *Akkawi v. Sadr*, 2:20-CV-01034-MCE-AC, 2021 WL 3912151, at *4 (E.D. Cal. Sept. 1, 2021) (citing *Maracich v. Spears*, 570 U.S. 48, 51–52 (2013) (alterations in original)). The sale of private information like driver's license numbers and other motor vehicle records was the exact impetus for the DPPA's passage.

70.     As such, Congress sought to expressly prohibit "disclosing personal information obtained by the department in connection with a motor vehicle record." *Chamber of Commerce of United States v. City of Seattle*, 274 F. Supp. 3d 1140, 1154 (W.D. Wash. 2017). Driver's license numbers are thus explicitly listed as "personal information" from "motor vehicle records" under the DPPA. *See* 18 U.S.C. 2725(1).

71.     The DPPA further states that "[i]t shall be unlawful for any person knowingly to obtain or disclose personal information, from a motor vehicle record, for any use not permitted under section 2721(b) of this title." 18 U.S.C. 2722(a).  By making the PI of Plaintiffs and the Class publicly available, Defendant knowingly disclosed the PI of Plaintiffs and Class Members and otherwise ran afoul of the purpose of the DPPA, and threatened the privacy and safety of licensed drivers, for whose protection the statute was enacted. Defendant's actions constituted a concrete injury and particularized harm to Plaintiffs and members of the Class, that would not have happened but for Defendant's

failure to comply with the DPPA. Plaintiffs were harmed by the public disclosure of their private facts in addition to the other harms enumerated herein.

72. The unauthorized disclosures of information have long been seen as injurious. The common law alone will sometimes protect a person's right to prevent the dissemination of private information. Indeed, it has been said that privacy torts have become well-ensconced in the fabric of American law. And with privacy torts, improper dissemination of information can itself constitute a cognizable injury. Because damages for a violation of an individual's privacy are a quintessential example of damages that are uncertain and possibly unmeasurable, causes of action such as the DPPA provide privacy tort victims with a monetary award calculated without the need of proving actual damages. The DPPA states that "[a] [s]tate department of motor vehicles, and any officer, employee, or contractor thereof, shall not knowingly disclose or otherwise make available to any person or entity: personal information, as defined in 18 U.S.C. 2725(3), about any individual obtained by the department in connection with a motor vehicle record, except as provided in subsection (b) of this section." 18 U.S.C. § 2721(a)(1).

73. Defendant had an obligation to use reasonable security measures under the DPPA, which further states that "[i]t shall be unlawful for any person knowingly to obtain or disclose personal information, from a motor vehicle record, for any use not permitted under section 2721(b) of this title." 18 U.S.C. § 2722(a).

74. Thus, the DPPA provides citizens with a private right of action in the event that their private information is knowingly obtained, disclosed, or used in a manner other than for the enumerated permissible purposes. The DPPA states: "[a] person who

knowingly obtains, discloses or uses personal information, from a motor vehicle record, for a purpose not permitted under this chapter [18 U.S.C. §§ 2721, *et seq.]* shall be liable to the individual to whom the information pertains, who may bring a civil action in a United States district court." 18 U.S.C. § 2724(a).

75.    The default rule under the DPPA is non-disclosure. The DPPA is structured such that 18 U.S.C. § 2721(a)(1) and 18 U.S.C. § 2722(a) provide the general prohibition on the release and use of motor vehicle information, and § 2721(b) enumerates fourteen specific exceptions to the general prohibition. Disclosing information to cyber criminals is not one of them. Because the PI was disclosed to unauthorized individuals—i.*e.,* cyber criminals—there is no argument to be made that disclosure was "for a permissible purpose."

76.    Critically, only Cornerstone had control over the configuration and design of its own systems, and knowingly chose to forego the necessary data protection techniques needed for it to secure Plaintiffs' and Class Members' PI.

77.    Despite the clear dangers that the insecure use of PI poses, Cornerstone knowingly chose to configure and design its systems to disclose Plaintiffs' and Class Members' PI to unauthorized third parties.

78.    As a result of Defendant's failure to prevent the Unauthorized Data Disclosure, Plaintiffs and Class Members have suffered and will continue to suffer injuries, including loss of time and productivity through efforts to ameliorate, mitigate, and deal with the future consequences of the Unauthorized Data Disclosure; theft of their valuable PI; the actual, imminent, and certainly impeding injury flowing from fraud and identity

theft posed by their PI being disclosed to unauthorized recipients and cyber criminals; damages to and diminution in value of their PI; and continued risk to Plaintiffs' and the Class Members' PI, which remains in the possession of Defendant and which is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect the PI that was entrusted to it.

**F.  Plaintiffs' Injuries—Attempts to Secure PI After the Disclosure.**

79.  Defendant admitted there was unauthorized access to and disclosure of Plaintiffs' and Class Members' PI in the Notice Letter, as well as that Plaintiffs' and Class Members' PI was likely viewed and accessed from, and taken off of, Defendant's computer networks.[54] In the letter, Defendant also recognized that the unauthorized access and disclosure created imminent harm to Plaintiffs and Class Members—and specifically directed Plaintiffs and Class Members to remain "vigilant and monitor your accounts for suspicious or unusual activity."[55]

80.  Defendant also offered credit monitoring due to the imminent risk to Plaintiffs and Class Members.[56] Plaintiffs and Class Members have been, and will continue to be, injured because they are now forced to spend time monitoring their credit and governmental communications—per Defendant's instructions, guarding against identity theft, and resolving fraudulent claims and charges because of Defendant's actions and/or inactions.

---

[54] *See supra* note 14.
[55] *Id.*
[56] *Id.*

81.     Plaintiff Johnson received the Notice Letter via mail after August 4, 2022, from Defendant that it improperly exposed his PI to unauthorized third parties. Plaintiff Johnson has never sought an insurance quote or been a customer of Cornerstone, and did not consent in any way to Cornerstone having, disclosing, using, or redisclosing his PI.

82.     Upon receiving notice of the above, and the Notice Letter from Defendant, Plaintiff Johnson spent time researching his options to respond to the theft of his driver's license. He spent and continues to spend additional time reviewing his credit and financial documents concerning the security of his identity. This is time Plaintiff Johnson otherwise would have spent performing other activities, such as his job and/or leisurely activities for the enjoyment of life.

83.     Additionally, Plaintiff Johnson has never knowingly transmitted unencrypted PI over the internet or any other unsecured source. He deletes any and all unencrypted, non-password protected electronic documents containing his PI and destroys any documents that contain any of his PI, or that may contain any information that could otherwise be used to compromise his PI.

84.     Plaintiff Johnson suffered actual injury from having his PI exposed as a result of the Unauthorized Data Disclosure including, but not limited to: (a) identity fraud; (b) loss of his privacy; and (c) imminent and impending further injury arising from the increased risk of fraud and identity theft.

85.     As a result of the Unauthorized Data Disclosure, Plaintiff Johnson was a victim of identity theft, and will continue to be at heightened risk for financial fraud, future identity theft, other forms of fraud, and the attendant damages, for years to come.

86.     Plaintiff Kirk received the Notice Letter via mail after August 4, 2022, from Defendant that it improperly exposed his PI to unauthorized third parties. Plaintiff Kirk has never sought an insurance quote or been a customer of Cornerstone, and did not consent in any way to Cornerstone having, disclosing, using, or redisclosing his PI.

87.     Following the Unauthorized Data Disclosure in November 2021 but prior to receiving the Notice Letter in August 2022, Plaintiff Kirk was notified on or about January 13, 2022, that an unauthorized individual applied for a loan in his name for approximately $4,727.00.  Plaintiff Kirk immediately placed a freeze on his credit upon learning of the fraudulent loan application.  On or about January 13, 2022, Plaintiff Kirk also filed a police report related to the fraudulent activity.

88.     On or about July 25, 2022, Plaintiff Kirk received a phone call from Avis Car Rental's loss prevention department inquiring about the whereabouts of a car they claim that he rented on March 8, 2022.  Plaintiff Kirk explained that he had his identity stolen and did not rent a car.

89.     Plaintiff Kirk filed a police report with the Kingsport and Nashville police departments regarding the fraudulent car rental in his name.  Plaintiff sent copies of both reports to Avis Car Rental.

90.     Avis Car Rental informed Plaintiff Kirk that they would conduct an investigation and let him know the results.  To date, Plaintiff has not been notified of the investigation result.

91.     Upon receiving notice of the above, and the Notice Letter from Defendant, Plaintiff Kirk spent time researching his options to respond to the theft of his driver's

license, including freezing his credit, removing the fraudulent loan entry from his credit report, and filing three police reports for the two incidents of fraud he experienced.

92.     He spent and continues to spend additional time reviewing his credit and financial documents concerning the security of his identity. This is time Plaintiff Kirk otherwise would have spent performing other activities, such as his job and/or leisurely activities for the enjoyment of life.

93.     Additionally, Plaintiff Kirk has never knowingly transmitted unencrypted PI over the internet or any other unsecured source. He deletes any and all unencrypted, non-password protected electronic documents containing his PI and destroys any documents that contain any of his PI, or that may contain any information that could otherwise be used to compromise his PI.

94.     Plaintiff Kirk suffered actual injury from having his PI exposed as a result of the Unauthorized Data Disclosure including, but not limited to: (a) identity fraud; (b) loss of his privacy; and (c) imminent and impending further injury arising from the increased risk of fraud and identity theft.

95.     The identity theft suffered by Plaintiff Kirk is logically and temporally linked to the Unauthorized Data Disclosure in the same way that other data breach cases have found to be "fairly traceable." His driver's license number was stolen directly from Cornerstone's website by an unauthorized third party who accessed the website for the purpose of stealing PI like Plaintiff Kirk's driver's license.

96.     As a result of the Unauthorized Data Disclosure, Plaintiff Kirk was a victim of identity theft, and will continue to be at heightened risk for financial fraud, future identity theft, other forms of fraud, and the attendant damages, for years to come.

**G.      Plaintiffs and Class Members Suffered Additional Damages.**

97.     Plaintiffs and Class Members are at ongoing risk for actual identity theft in addition to all other forms of fraud.

98.     The ramifications of Defendant's disclosure and failure to keep individuals' PI secure are long lasting and severe. Once PI is disseminated to unauthorized parties, fraudulent use of that information and damage to victims may continue for years.[57]

99.     Plaintiffs' and Class Members' PI is private, valuable, and sensitive in nature as it can be used to commit a lot of different harms and fraud in the hands of the wrong people. Defendant failed to obtain Plaintiffs' and Class Members' consent to disclose such PI to any other person, as required by applicable law and industry standards.

100.    Defendant's inattention to the reality that anyone, especially thieves with various pieces of individuals' PI, could obtain any individual's PI through compromise of Defendant's computer systems left Plaintiffs and Class Members with no ability to protect their sensitive and private information.

101.    Defendant had the resources necessary to prevent the Unauthorized Data Disclosure, but neglected to adequately implement data security measures, despite its obligations to protect Plaintiffs' and Class Members' PI from unauthorized disclosure.

---

[57] *2014 LexisNexis True Cost of Fraud Study*, (August 2014), *available at*: https://www.lexisnexis.com/risk/downloads/assets/true-cost-fraud-2014.pdf (last visited Feb. 15, 2022).

102. Had Defendant remedied the deficiencies in its data security systems and adopted security measures recommended by experts in the field, it would have prevented the unauthorized access, disclosure, and ultimately, the theft of PI.

103. As a direct and proximate result of Defendant's actions and inactions, Plaintiffs and Class Members have been placed at an imminent, immediate, and continuing increased risk of harm from identity theft and fraud, requiring them to take the time which they otherwise would have dedicated to other life demands such as work and family in an effort to mitigate the actual and potential impact of the Unauthorized Data Disclosure on their lives.

104. The U.S. Department of Justice's Bureau of Justice Statistics found that "among victims who had personal information used for fraudulent purposes, 29% spent a month or more resolving problems" and that "resolving the problems caused by identity theft [could] take more than a year for some victims."[58]

105. As a result of Defendant's failure to prevent the Unauthorized Data Disclosure, Plaintiffs and Class Members have suffered, will suffer, and are at increased risk of suffering:

    a. The compromise, publication, theft, and/or unauthorized use of their PI;

    b. Out-of-pocket costs associated with the prevention, detection, recovery, and remediation from identity theft or fraud;

    c. Lost opportunity costs and lost wages associated with efforts expended and

---

[58] U.S. Department of Justice, Office of Justice Programs Bureau of Justice Statistics, *Victims of Identity Theft, 2012*, December 2013, *available at*: https://www.bjs.gov/content/pub/pdf/vit12.pdf (last visited Feb. 15, 2022).

the loss of productivity from addressing and attempting to mitigate the actual and future consequences of the Unauthorized Data Disclosure, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud;

d.  Compromise of their credit scores, access to credit, and other financial scores as a result of identity theft and compromised financial and driver's license information;

e.  Inability to access government services such as tax refunds or unemployment benefits because compromise of those accounts not only causes fraud but also makes it impossible to make legitimate claims;

f.  The continued risk to their PI, which remains in the possession of Defendant and is subject to further breaches so long as Defendant fails to undertake appropriate measures to protect the PI in its possession; and

g.  Current and future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, remediate, and repair the impact of the Unauthorized Data Disclosure for the remainder of the lives of Plaintiffs and Class Members.

106.    In addition to a remedy for the economic harm, Plaintiffs and Class Members maintain an undeniable interest in ensuring that their PI is secure, remains secure, and is not subject to further misappropriation and theft.

107.    To date, other than providing limited credit monitoring and identity protection services, none of which is targeted to driver's license information or designed to combat unemployment benefits fraud, Defendant does not appear to be taking any measures to assist Plaintiffs and Class Members other than simply telling them to do be vigilant themselves.

108. Defendant's failure to adequately protect Plaintiffs' and Class Members' PI has resulted in Plaintiffs and Class Members having to undertake these tasks, which require extensive amounts of time, calls, and, for many of the credit and fraud protection services, payment of money. Instead, as Defendant's Notice indicates, they are putting the burden on Plaintiffs and Class Members to discover possible fraudulent activity and identity theft.

109. Defendant's offer of identity monitoring and identity protection services to Plaintiffs and Class Members is woefully inadequate. While some harm has begun already, the worst may be yet to come. There may be a time lag between when additional harm occurs versus when it is discovered, and also between when PI is acquired and when it is used.

## CLASS ACTION ALLEGATIONS

110. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action on behalf of themselves and the following proposed Nationwide Class (the "Class") as defined as follows:

> Nationwide Class: All persons in the United States whose PI was compromised in the Unauthorized Data Disclosure announced by Defendant on or near August 4, 2022.

111. Pursuant to Federal Rules of Civil Procedure 23(b)(2), (b)(3) and (c)(4), Plaintiff Johnson seeks certification of the following California state subclass ("California Subclass"):

> California Subclass: All persons in California whose PI was compromised in the Unauthorized Data Disclosure announced by Defendant on or near August 4, 2022.

112.    Pursuant to Federal Rules of Civil Procedure 23(b)(2), (b)(3) and (c)(4), Plaintiff Kirk seeks certification of the following Tennessee state subclass ("Tennessee Subclass"):

> Tennessee Subclass: All persons in Tennessee whose PI was compromised in the Unauthorized Data Disclosure announced by Defendant on or near August 4, 2022.

113.    The Nationwide Class and California and Tennessee Subclasses are collectively referred to herein as "Class" unless otherwise stated.

114.    Excluded from the proposed Class are any officer or director of Defendant; any officer or director of any affiliate, parent, or subsidiary of Defendant; anyone employed by counsel in this action; and any judge to whom this case is assigned, his or her spouse, and members of the judge's staff.

115.    **Numerosity.** Members of the proposed Class likely number in at least the hundreds of thousands and are thus too numerous to practically join in a single action. Membership in the Class is readily ascertainable from Defendant's own records.

116.    **Commonality and Predominance.** Common questions of law and fact exist as to all proposed Class Members and predominate over questions affecting only individual Class Members. These common questions include:

a.   Whether Defendant engaged in the wrongful conduct alleged herein;

b.   Whether Defendant's inadequate data security measures were a cause of the Unauthorized Data Disclosure;

c. Whether Defendant's actions were knowing in improperly disclosing driver's license numbers to unauthorized parties and/or entities;

d. Whether Defendant negligently or recklessly breached legal duties owed to Plaintiffs and the other Class Members to exercise due care in collecting, storing, and safeguarding their PI;

e. Whether Defendant disclosed PI obtained from the records of Defendant or third parties without the permission or consent of Plaintiffs and the Class;

f. Whether Plaintiffs and the Class are at an increased risk for identity theft because of the data security breach;

g. Whether Defendant violated the Drivers' Privacy Protection Act, 18 U.S.C. § 2724,

h. Whether Defendant was negligent;

i. Whether Plaintiffs and the Class Members are entitled to actual, statutory, or other forms of damages, and other monetary relief; and

j. Whether Plaintiffs and the Class Members are entitled to equitable relief, including, but not limited to, injunctive relief and restitution.

117.    Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs individually and on behalf of the other Class Members. Similar or identical statutory and common law violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quantity and quality, to the numerous questions that dominate this action.

118. **Typicality:** Plaintiffs' claims are typical of the claims of the members of the Class. All Class Members were subject to the Unauthorized Data Disclosure and had their PI accessed by, used and/or disclosed to unauthorized third parties. Defendant's misconduct impacted all Class Members in the same manner.

119. **Adequacy of Representation:** Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the other Class Members they seeks to represent; they retained counsel competent and experienced in complex class action litigation, and Plaintiffs will prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

120. **Superiority:** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this matter as a class action. The damages, harm, or other financial detriment suffered individually by Plaintiffs and the Class Members pale compared to the burden and expense that would be required to litigate their claims on an individual basis against Defendant, making it impracticable for Class Members to individually seek redress for Defendant's wrongful conduct. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation would create a potential for inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

# FIRST CAUSE OF ACTION

## Violation of the Drivers' Privacy Protection Act ("DPPA"), 18 U.S.C. § 2721, *et seq.*

### (On behalf of Plaintiffs, the Nationwide Class, and the California and Tennessee Subclasses)

121.    Plaintiffs incorporate and reallege the above allegations by reference.

122.    Pursuant to 18 U.S.C. § 2722(a), "[i]t shall be unlawful for any person knowingly to obtain or disclose personal information, from a motor vehicle record, for any use not permitted under section 2721(b) of this title."

123.    Pursuant to 18 U.S.C. § 2721(a)(1), "[a] [s]tate department of motor vehicles, and any officer, employee, or contractor thereof, shall not knowingly disclose or otherwise make available to any person or entity: personal information, as defined in 18 U.S.C. 2725(3), about any individual obtained by the department in connection with a motor vehicle record, except as provided in subsection (b) of this section."

124.    The DPPA provides that "[a] person who knowingly obtains, discloses or uses personal information, from a motor vehicle record, for a purpose not permitted under this chapter shall be liable to the individual to whom the information pertains." 18 U.S.C. § 2724.

125.    "Person" is defined as "an individual, organization or entity." 18 U.S.C. § 2725(2). Cornerstone is a "person" under the DPPA.

126.    Further, the definition of "disclose" is "to make known or public" or "expose to view."[59]  Defendant's voluntary action of exposing Plaintiffs' and Class Members' PI

---

[59] https://www.merriam-webster.com/dictionary/disclose (Last accessed Aug. 31, 2022).

constitutes a knowing disclosure. In particular, Defendant intentionally configured and designed their online agent portal to generate responses to requests for insurance quotes that included PI from motor vehicle records. In doing so, unauthorized actors were able to access and obtain the PI of Plaintiffs and Class Members for nefarious purposes.

127. The DPPA also restricts the resale and redisclosure of personal information, and requires authorized recipients to maintain records of each individual and the permitted purpose of the disclosure for a period of five years. 18 U.S.C. § 2721(c).

128. Under the DPPA, a "'motor vehicle record' means any record that pertains to a motor vehicle operator's permit, motor vehicle title, motor vehicle registration, or identification card issued by a department of motor vehicles.'" 18 U.S.C. § 2725(1). Drivers' license numbers are motor vehicle records and personal information under the DPPA. 18 U.S.C. § 2725(3); *see also Dahlstrom v. Sun-Times Media, LLC*, 777 F.3d 937, 943 (7th Cir. 2015).

129. Defendant obtains, uses, discloses, resells, and rediscloses motor vehicle records from its customers. Cornerstone obtains motor vehicle records as part of its business operations intended to generate online insurance quotes and/or insurance policy processing for profit.

130. Defendant also obtains motor vehicle records directly from state agencies or through resellers who sell such records. Defendant knowingly obtained and/or disclosed Plaintiffs' and Class Member's personal information, which came from a motor vehicle record, for a purpose not permitted under the DPPA.

131.    Defendant knowingly used motor vehicle records for uses not permitted by the statute, including sales, and marketing, among other impermissible uses. Defendant's disclosure of Plaintiffs' and Class Members' personal information to unauthorized individuals violated 18 U.S.C. §§ 2722(a) and/or 2721(a)(1).

132.    Defendant's disclosure of personal information was not a permitted use under 18 U.S.C. § 2721(b).

133.    Defendant knowingly and voluntarily configured and designed its insurance quote application portal system to disclose Plaintiffs' and Class Members' PI to anyone with access who requested an insurance quote, all in direct violation of the DPPA.

134.    Defendant failed to use reasonable care in protecting Plaintiffs' and Class Members' PI by installing substandard security measures that failed to protect it and voluntarily disclosed it to cyber criminals through the intentional configuration and design of its insurance quote application portal.

135.    Alternatively, Defendant had actual and/or constructive notice of the risk to Plaintiffs' and the Class Members' PI because it should have been aware that failing to incorporate basic security measures in the configuration and design of its online insurance quoting and agent platform, such as authentication of the person requesting the quote, would cause the improper disclosure of Plaintiffs' and Class Members' PI.

136.    Further, Cornerstone had actual and or/constructive notice of the February 2021 Cyber Fraud Alert and March 2021 Cyber Fraud Alert Follow-Up which informed Cornerstone that cyber criminals were exploiting cybersecurity flaws on automobile

insurance websites who give out driver's license information by stealing nonpublic information, including driver's license numbers.

137.  At the very least, Cornerstone was willfully ignorant that its website, servers, and systems were configured and designed without any protections to store Plaintiffs' and Class Members' PI and would disclose that personal information to cyber criminals.

138.  Merriam-Webster's dictionary defines "disclose" as "to make known or public," "to expose to view," or, alternatively, "to open up." None of these definitions requires an identified intended recipient. Instead, disclosure is the act of exposure. Whether or not Defendant meant for identifiable third parties to access the information is not relevant. All that is required for a knowing disclosure is a voluntary action.

139.  Defendant knowingly failed to protect its computer systems and/or linked its respective public websites and business to systems and/or networks storing, maintaining, and/or obtaining Plaintiffs' and Class Members' PI, including the application and agent portal.

140.  Pursuant to 18 U.S.C. § 2724(b)(1)-(4), Plaintiffs seek, on behalf of themselves and members of the Class (1) actual damages, not less than statutory liquidated damages in the amount of $2,500; (2) punitive damages; (3) reasonable attorneys' fees and costs; and (4) preliminary and equitable relief as the Court determines to be appropriate.

# SECOND CAUSE OF ACTION

## Negligence

## (On behalf of Plaintiffs, the Nationwide Class, and the California and Tennessee Subclasses)

141.     Plaintiffs incorporate and reallege the above allegations by reference.

142.     Defendant owed a duty to Plaintiffs and the Class Members to exercise reasonable care in obtaining, securing, safeguarding, storing, and protecting Plaintiffs' and Class Members' PI from being compromised, lost, stolen, and accessed by unauthorized persons. This duty includes, among other things, designing, implementing, maintaining, and testing its data security systems to ensure Plaintiffs' and Class Members' PI in Defendant's possession, or that could be accessed by Defendant, was adequately secured and protected.

143.     Defendant owed a duty of care to Plaintiffs and Members of the Class to provide security, consistent with industry standards, to ensure that its systems and networks adequately protected PI it stored, maintained, used, and/or obtained.

144.     Defendant owed a duty of care to Plaintiffs and Members of the Class because they were foreseeable and probable victims of any inadequate data security practices. Defendant knew or should have known of the inherent risks in having inadequate data security for private PI without the consent or authorization of the person whose PI was being provided.

145.     Unbeknownst to Plaintiffs and Class Members, they were entrusting Defendant with their PI when Defendant obtained their PI from motor vehicle records

directly from state agencies or through resellers who sell such records, as well as through other channels. Defendant had an obligation to safeguard Plaintiffs' and Class Members' information and were in a position to protect against the harm suffered by Plaintiffs and Class Members as a result of the Unauthorized Data Disclosure.

146. In addition, Defendant required Plaintiffs and Class Members to submit sensitive personal information, including their PI, in order to obtain insurance, and used vast troves of PI on its websites and in portals unbeknownst to Plaintiffs and Class Members. Defendant stored this vast treasure trove of PI on unsecured and inadequate computer networks.

147. By collecting, storing, using, and profiting from this data, Defendant had a duty of care to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting this PI in Defendant's possession, custody or control from being compromised, lost, stolen, accessed, and misused by unauthorized persons. More specifically, this duty included, among other things: (a) designing, maintaining, and testing Defendant's security systems and data storage architecture to ensure that Plaintiffs' and Class Members' PI was adequately secured and protected; (b) implementing processes that would detect an unauthorized breach of Defendant's security systems and data storage architecture in a timely manner; (c) limiting access to insurance agent sensitive websites and portals, not overpermissioning, maintaining password and firewall security, and otherwise securing its online agent databases, websites, and portals; (d) timely acting upon all warnings and alerts, including public information, regarding Defendant's security vulnerabilities and potential compromise of the compiled

data of Plaintiffs and hundreds of thousands of Class Members; and (e) maintaining data security measures consistent with industry standards.

148. Defendant's own conduct also created a foreseeable risk of harm to Plaintiffs and Class Members and their PI. Defendant's misconduct included failing to implement the systems, policies, and procedures necessary to prevent the Unauthorized Data Disclosure.

149. Defendant acknowledged its conduct created actual harm to Plaintiffs and Class Members because Defendant warned of the potential for identity theft as a result of the Unauthorized Data Disclosure, and offered credit monitoring.

150. Defendant knew, or should have known, of the risks inherent in collecting and storing PI and the importance of adequate security. Defendant knew about—or should have been aware of—numerous, well-publicized unauthorized data disclosures affecting businesses, especially insurance and financial businesses, in the United States.

151. Defendant breached its duties to Plaintiffs and Class Members by failing to provide fair, reasonable, or adequate computer systems and data security to safeguard Plaintiffs' and Class Members' PI.

152. Because Defendant knew that a breach of its systems, especially insurance agent portals and other systems with motor vehicle records, would damage millions of individuals whose PI was inexplicably stored or was accessible, including Plaintiffs and Class Members, Defendant had a duty to adequately protect its data systems and the PI contained and/or accessible therein.

153.    Defendant also had independent duties under state and federal laws requiring Defendant to reasonably safeguard Plaintiffs' and Class Members' PI.

154.    Defendant also had common law duties to prevent foreseeable harm to Plaintiffs and Class Members. These duties existed because Plaintiffs and Class Members were the foreseeable and probable victims of any inadequate security practices. In fact, not only was it foreseeable that Plaintiffs and Class Members would be harmed by the failure to protect their PI because hackers routinely attempt to steal such information and use it for nefarious purposes, Defendant knew that it was more likely than not Plaintiffs and other Class Members would be harmed by such theft.

155.    Defendant had a duty to monitor, supervise, control, or otherwise provide oversight to safeguard the PI that was collected and stored Defendant's computer networks.

156.    Defendant's duties to use reasonable data security measures also arose under Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect PI. Various FTC publications and data security breach orders further form the basis of Defendant's duties. In addition, individual states have enacted statutes based upon the FTC Act that also created a duty.

157.    Defendant knew or should have known that its computing systems and data storage architecture were vulnerable to unauthorized access and targeting by hackers for the purpose of stealing and misusing confidential PI.

158. Defendant breached the duties it owed to Plaintiffs and Class Members described above and thus was negligent. Defendant breached these duties by, among other things, failing to: (a) exercise reasonable care and implement adequate security systems, protocols and practices sufficient to protect the PI of Plaintiffs and Class Members; (b) detect the breach while it was ongoing or promptly after it occurred; (c) maintain security systems consistent with industry standards; and (d) promptly notify Plaintiffs and Class Members.

159. In engaging in the negligent acts and omissions as alleged herein, which permitted thieves to access Defendant's systems that stored and/or had access to Plaintiffs' and Class Members' PI, Defendant violated Section 5 of the FTC Act, which prohibits "unfair…practices in or affecting commerce." This includes failing to have adequate data security measures and failing to protect Plaintiffs' and the Class Members' PI.

160. Plaintiffs and the Class Members are among the class of persons Section 5 of the FTC Act was designed to protect, and the injuries suffered by Plaintiffs and Class Members are the types of injury Section 5 of the FTC Act was intended to prevent.

161. But for Defendant's wrongful and negligent breach of its duties owed to Plaintiffs and Class Members, their PI would not have been compromised.

162. Neither Plaintiffs nor the other Class Members contributed to the Unauthorized Data Disclosure as described in this Complaint.

163. As a direct and proximate cause of Defendant's conduct, Plaintiffs and Class Members have suffered and/or will suffer injury and damages, including but not limited to: (i) the loss of the opportunity to determine for themselves how their PI is used; (ii) the

publication and/or theft of their PI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PI; (iv) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Unauthorized Data Disclosure, including but not limited to efforts spent researching how to prevent, detect, contest and recover from unemployment and/or tax fraud and identity theft; (v) costs associated with placing freezes on credit reports, compromises to credit scores, and access to state and tax benefits and refunds; (vi) anxiety, emotional distress, loss of privacy, and other economic and non-economic losses; (vii) the continued risk to their PI, which remains in Defendant's possession (and/or Defendant had access to) and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PI in its continued possession; and, (viii) future costs in terms of time, effort and money that will be expended to prevent, detect, contest, and repair the inevitable and continuing consequences of compromised PI.

### THIRD CAUSE OF ACTION

### Negligence *Per Se*

### (On behalf of Plaintiffs, the Nationwide Class, and the California and Tennessee Subclasses)

164.    Plaintiffs incorporate and reallege the above allegations by reference.

165.    Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or

practice by Defendant of failing to use reasonable measures to protect PI. Various FTC publications and orders also form the basis of Defendant's duty.

166. Defendant violated Section 5 of the FTC Act (and similar state statutes) by failing to use reasonable measures to protect PI and not complying with industry standards. Defendant's conduct was particularly unreasonable given the nature and amount of PI obtained and stored and the foreseeable consequences of a data breach on Defendant's systems.

167. Defendant's duty to use reasonable security measures also arose under the DPPA, under which Cornerstone was required to protect the privacy, confidentiality, and integrity of driver's license information and only to use driver's license information in a permissible fashion.

168. Defendant's violation of Section 5 of the FTC Act (and similar state statutes) along with the DPPA constitutes negligence *per se*.

169. Plaintiffs and Class members are consumers within the class of persons Section 5 of the FTC Act (and similar state statutes), and the DPPA, were intended to protect. Plaintiffs and Class Members are within the class of persons that the DPPA was intended to protect against because the DPPA was expressly designed to protect a person's personal information contained in motor vehicle records from unauthorized disclosure.

170. Moreover, the harm that has occurred is the type of harm the FTC Act (and similar state statutes) and the DPPA were intended to guard against. Indeed, the FTC has pursued over fifty enforcement actions against businesses which, as a result of its failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused

the same harm suffered by Plaintiffs and Class Members. The DPPA was similarly enacted as a direct result of failures to protect consumer privacy like those outlined above, and is intended to guard against the unauthorized disclosure of personal information from motor vehicle records.

171.    As a direct and proximate result of Defendant's negligence, Plaintiffs and Class Members have been injured and are entitled to damages in an amount to be proven at trial. Such injuries include one or more of the following: ongoing, imminent, certainly impending threat of identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; loss of the value of their privacy and the confidentiality of the stolen PI; illegal sale of the compromised PI on the black market; mitigation expenses and time spent on credit monitoring, identity theft insurance, and credit freezes and unfreezes; time spent in response to the Unauthorized Data Disclosure reviewing bank statements, credit card statements, and credit reports; expenses and time spent initiating fraud alerts; decreased credit scores and ratings; lost work time; lost value of the PI; lost benefit of their bargains and overcharges for services; and other economic and non-economic harm.

**FOURTH CAUSE OF ACTION**

**Violation of the California Consumer Privacy Act,**

**Cal. Civ. Code § 1798.100, *et seq*.**

**(On behalf of Plaintiff Johnson, the Nationwide Class, and California Subclass)**

172.    Plaintiffs incorporate and reallege the above allegations by reference.

173. Plaintiff Johnson and the California Subclass members are "consumer[s]" as that term is defined in Cal. Civ. Code § 1798.140(g).

174. Cornerstone is a "business" as that term is defined in Cal. Civ. Code. § 1798.140(c). Defendant collects consumers' (including Plaintiff Johnson's and California Subclass Members') personal information and determines the purposes and means of the processing of this personal information (e.g., it collects PI for the purpose of analyzing the information for insurance quotes, and designs the systems that process and store consumers' PI). Cornerstone annually receives for commercial purposes or shares for commercial purposes, alone or in combination, the personal information of 50,000 or more consumers.

175. Plaintiff Johnson's and California Subclass Members' PI is "nonencrypted and nonredacted personal information" as that term is used in Cal. Civ. Code § 1798.150(a)(1). At a minimum, this PI included the individual's name and unique identification number issued on government documents (e.g., driver's license number).

176. The Unauthorized Data Disclosure constitutes "an unauthorized access and exfiltration, theft, or disclosure" pursuant to Cal. Civ. Code § 1798.150(a)(1).

177. Under the CCPA, Cornerstone had a duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the Plaintiff Johnson's and California Subclass Members' PI to protect said PI.

178. Cornerstone breached the duty it owed to Plaintiff Johnson and California Subclass Members by, among other things, failing to: (a) exercise reasonable care and implement adequate security systems, protocols, and practices sufficient to protect Plaintiff

Johnson's and California Subclass Members' PI; (b) detect the Unauthorized Data Disclosure while it was ongoing; and (c) maintain security systems consistent with industry standards.

179.    Defendant's breach of the duty it owed to Plaintiff Johnson and California Subclass Members described above was the direct and proximate cause of the Data Breach. As a result, Plaintiff Johnson and California Subclass members suffered damages, as described above and as will be proven at trial.

180.    Plaintiffs seek injunctive relief in the form of an order enjoining Defendant from continuing the practices that constituted its breach of the duty owed to Plaintiff Johnson and California Subclass Members as described above, and to implement improved security procedures and measures, specifically:

        a.    Ordering Defendant engage third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors,

        b.    Ordering Defendant engage third–party security auditors and internal personnel to run automated security monitoring,

        c.    Ordering Cornerstone audit, test, and train its security personnel regarding any new or modified procedures,

d.      Ordering Defendant not to make PI available without adequate and reasonable safeguards in its agent portal or website;

e.      Ordering Defendant not to store PI or make PI accessible in any publicly facing website or portal,

f.      Ordering Defendant purge, delete, and destroy in a reasonably secure manner customer data not necessary for its provisions of services,

g.      Ordering Defendant conduct regular computer system scanning and security checks; and

h.      Ordering Defendant routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a disclosure when it occurs and what to do in response to a breach.

181.    Plaintiffs also seek actual damages, and all other forms of relief available under the CCPA.

182.    Contemporaneously with filing this Complaint, and on or about September 14, 2022, Plaintiff Johnson sent via registered mail the 30-day notice letter as required under Civil Code section 1798.150, subd. (b). Plaintiffs and California Subclass Members reserve the right to amend this Complaint as of right to seek statutory damages and relief following the expiration of the 30-day period.

# FIFTH CAUSE OF ACTION

## Violation of the California's Unfair Competition Law,

## Cal. Bus. & Prof. Code § 17200, *et seq.*

### (On behalf of Plaintiff Johnson, the Nationwide Class, and California Subclass)

183.    Plaintiffs incorporate and reallege the above allegations by reference.

184.    By reason of the conduct alleged herein, Cornerstone engaged in unlawful and unfair business practices within the meaning of California's Unfair Competition Law ("UCL"), Business and Professions Code § 17200, *et seq*.

185.    Cornerstone stored, disclosed, and/or provided access to Plaintiff Johnson's and Class Members' PI through its online agent portal and insurance quote platform and website.

186.    Defendant knew or should have known it did not employ reasonable, industry standard, and appropriate security measures in compliance with federal regulations that would have kept Plaintiff Johnson's and Class Members' PI secure, and prevented the unauthorized disclosure, loss, or misuse of that PI.

**Unlawful Business Practices.**

187.    Defendant violated the DPPA, Section 5(a) of the FTC Act, the GLB Act, and California Civil Code § 1798.81.5(b) by failing to implement and maintain reasonable and appropriate security measures or follow industry standards for data security.

188.    If Defendant had complied with these legal requirements, Plaintiff Johnson and Class Members would not have suffered the damages related to the Unauthorized Data Disclosure.

189.    Plaintiff Johnson and Class Members suffered injury in fact and lost money or property as the result of Defendant's unlawful business practices. In addition, Plaintiff Johnson's and Class Members' PI was accessed, disclosed, taken, viewed, and now in the possession of those who will use it for their own advantage, and/or is being sold for value— making it clear that Plaintiff Johnson's and Class Members' PI is of tangible value. Plaintiff Johnson and Class Members have also suffered consequential out-of-pocket losses for procuring credit freezes, credit protection services, identity theft monitoring, and/or other expenses relating to identity theft losses or protective measures.

**Unfair Business Practices.**

190.    <u>Balancing Test</u>. Defendant engaged in unfair business practices under the "balancing test." The harm caused by Defendant's actions and omissions, as described in detail above, greatly outweigh any perceived utility. Indeed, none of Defendant's actions or inactions can be said to have had any utility at all. Defendant's failures were clearly injurious to Plaintiff Johnson and Class Members, directly causing the harms alleged in the Complaint.

191.    <u>Tethering Test</u>. Defendant also engaged in unfair business practices under the "tethering test." Defendant's actions and omissions, as described in detail above, violated fundamental public policies expressed by the California Legislature. (*See, e.g.*, Cal. Civ. Code § 1798.1, "The Legislature declares that . . . all individuals have a right of privacy in information pertaining to them . . . . The increasing use of computers . . . has greatly magnified the potential risk to individual privacy that can occur from the maintenance of personal information."; Cal. Civ. Code § 1798.81.5(a), "It is the intent of

the Legislature to ensure that personal information about California residents is protected.";

Cal. Bus. & Prof. Code § 22578, "It is the intent of the Legislature that this chapter

[including the Online Privacy Protection Act] is a matter of statewide concern.") Therefore,

Defendant's acts and omissions amount to a violation of the law.

192.    *FTC Test*. Defendant engaged in unfair business practices under the "FTC

test." The harm caused by Defendant's actions and omissions, as described in detail above,

are substantial in that they affect Plaintiff Johnson and hundreds of thousands of Class

Members, and caused them to suffer actual harms. Such harms include actual identity theft,

a substantial and continuing risk of identity theft, disclosure of Plaintiff Johnson's and

Class Members' PI to third parties without their consent, diminution in value of their PI,

consequential out-of-pocket losses for procuring credit freezes, credit protection services,

identity theft monitoring, and/or other expenses relating to identity theft losses or protective

measures. This harm continues for two reasons. First, Plaintiff Johnson's and Class

Members' PI remains in Defendant's possession, without adequate protection. Second,

Plaintiff Johnson's and Class Members' PI is now possessed by those who obtained it

without Plaintiff Johnson's and Class Members' consent. Defendant's actions and

omissions violated Section 5(a) of the Federal Trade Commission Act. (*See* 15 U.S.C.

§ 45(n), defining "unfair acts or practices" as those that "cause[ ] or [are] likely to cause

substantial injury to consumers which [are] not reasonably avoidable by consumers

themselves and not outweighed by countervailing benefits to consumers or to competition";

*see also, e.g.*, *In re LabMD, Inc.*, FTC Docket No. 9357, FTC File No. 102-3099 (July 28,

2016), failure to employ reasonable and appropriate measures to secure personal information collected violated § 5(a) of FTC Act).

193.    Plaintiff Johnson and Class Members suffered injury in fact, and lost money or property as the result of Defendant's unfair business practices. Plaintiff Johnson's and Class Members' PI was improperly accessed, disclosed, and taken and is now in the hands of those who will use it for their own advantage, potentially—and likely—selling the PI for value—making it clear that Plaintiff Johnson's and Class Members' PI is of tangible value. Plaintiff Johnson and Class Members have also suffered consequential out-of-pocket losses for procuring credit freezes, credit protection services, identity theft monitoring, and/or other expenses relating to identity theft losses or protective measures.

194.    As a result of Defendant's unlawful and unfair business practices in violation of the UCL, Plaintiff Johnson and Class Members are entitled to equitable and injunctive relief, including restitution or disgorgement.

## SEVENTH CAUSE OF ACTION

### Declaratory and Injunctive Relief

### (On behalf of Plaintiffs, the Nationwide Class, and the California and Tennessee Subclasses)

195.    Plaintiffs incorporate and reallege the above allegations by reference.

196.    This Cause of Action is brought under the federal Declaratory Judgment Act, 28 U.S.C. § 2201. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, et seq., the Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain

acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

197. As previously alleged, Plaintiffs and Class Members had a reasonable expectation that companies such as Defendant, who could access their PI through automated systems and collect untold volumes of PI, would provide adequate security for that PI.

198. Defendant owed a duty of care to Plaintiffs and Class Members requiring it to adequately secure PI.

199. Defendant still possesses PI regarding Plaintiffs and Class Members and still uses it for its insurance business.

200. Since the Unauthorized Data Disclosure, Defendant has announced few if any changes to their data security infrastructure, processes, or procedures to fix the vulnerabilities in their computer systems and/or security practices which permitted the Unauthorized Data Disclosure to occur and, thereby, prevent further attacks. The only comments in the notice of data breach were vague, unclear, and noncommittal.

201. The Unauthorized Data Disclosure caused actual harm because of Defendant's failure to fulfill their duties of care to provide security measures to Plaintiffs and Class Members. Further, Plaintiffs and Class Members are at risk of additional or further harm due to the exposure of their PI and Defendant's failure to address the security failings that lead to such exposure.

202. There is no reason to believe that Defendant's security measures are more adequate now than they were before the Unauthorized Data Disclosure to meet Defendant's legal duties.

203. An actual controversy has arisen in the wake of the Unauthorized Data Disclosure regarding its present and prospective common law and other duties to reasonably safeguard its customers' PI and whether Defendant are currently maintaining data security measures adequate to protect Plaintiffs and Class Members from further data breaches that compromise their PI. Plaintiffs remain at ongoing and imminent risk that further compromises of their PI will occur in the future.

204. Plaintiffs, therefore, seek a declaration (1) that Defendant's existing security measures do not comply with their duties of care to provide adequate security, and (2) that to comply with their duties of care, Defendant must implement and maintain reasonable security measures, including, but not limited to:

a. Ordering Defendant engage third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors,

b. Ordering Defendant engage third–party security auditors and internal personnel to run automated security monitoring,

c. Ordering Cornerstone audit, test, and train its security personnel regarding any new or modified procedures,

d. Ordering Defendant not to make PI available on any publicly-facing webpage and to adequately secure PI in any website, portal, agent system, or network computer system,

e. Ordering Defendant purge, delete, and destroy in a reasonably secure manner customer data not necessary for its provisions of services,

f. Ordering Defendant to conduct regular computer system scanning and security checks; and

g. Ordering Defendant to routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a disclosure when it occurs and what to do in response to a breach.

205. If an injunction is not issued, Plaintiffs and Class Members will suffer irreparable injury, and lack an adequate legal remedy, in the event of another unauthorized data disclosure by Defendant. The risk of another such disclosure is real, immediate, and substantial. If another disclosure occurs, Plaintiffs and Class Members will not have an adequate remedy at law because many of the resulting injuries are not readily quantified and they will be forced to bring multiple lawsuits to rectify the same conduct.

206. The hardship to Plaintiffs and Class Members if an injunction does not issue exceeds the hardship to Defendant if an injunction is issued. Among other things, if another unauthorized data disclosure occurs because of Defendant, Plaintiffs and Class Members will likely be subjected to fraud, identify theft, and other harms described herein. On the other hand, the cost to Defendant of complying with an injunction by employing reasonable

prospective data security measures is relatively minimal, and Defendant have pre-existing legal obligations to employ such measures.

207.    Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data disclosure by Defendant, thus eliminating the additional injuries that would result to Plaintiffs and the millions of consumers whose PI would be further compromised.

## V. <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs, individually, and on behalf of all others similarly situated, respectfully request the Court enter an order:

a.  Certifying the proposed Class as requested herein,

b.  Appointing Plaintiffs as Class Representatives and undersigned counsel as Class Counsel,

c.  Finding that Defendant engaged in the unlawful conduct as alleged herein,

d.  Granting injunctive relief requested by Plaintiffs, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and Class Members;

e.  Awarding Plaintiffs and Class Members damages,

f.  Awarding Plaintiffs and Class Members pre-judgment and post-judgment interest on all amounts awarded,

g.  Awarding Plaintiffs and the Class Members reasonable attorneys' fees, costs, and expenses; and

h.  Granting such other relief as the Court deems just and proper.

## VI. DEMAND FOR JURY TRIAL

Plaintiffs, on behalf of themselves and the proposed Class of all others similarly situated, hereby demand a trial by jury as to all matters so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated: September 14, 2022        Respectfully submitted,

**STUEVE SIEGEL HANSON LLP**

/s/ *Norman E. Siegel*
Norman E. Siegel – MO #44378
Benjamin J. Stueve – MO #71197
460 Nichols Rd., Suite 200
Kansas City, MO 64112
Telephone: (816) 714-7100
Facsimile: (816) 714-7101
siegel@stuevesiegel.com
ben.stueve@stuevesiegel.com

**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**

Kate M. Baxter-Kauf (MN #0392037)
Karen Hanson Riebel (MN #0219770)
Mauren Kane Berg
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981
kmbaxter-kauf@locklaw.com
khriebel@locklaw.com
mkberg@locklaw.com

**CASEY GERRY SCHENK**
**FRANCAVILLA BLATT & PENFIELD, LLP**

Gayle M. Blatt
P. Camille Guerra
110 Laurel Street
San Diego, CA 92101
Telephone: (619) 238-1811
Facsimile: (619) 544-9232
gmb@cglaw.com
camille@cglaw.com

*Attorneys for Plaintiffs and the putative Class*